# STATE OF FLORIDA v. WOODS

Case No. 84-4825 CF C 02

Fifteenth Judicial Circuit, Palm Beach County

December 28, 1984

## APPEARANCES OF COUNSEL

**Frank Scott,** Assistant State Attorney, for plaintiff.

**William Lasley,** Assistant Public Defender, for defendant.

**Douglas Duncan** for Christopher Dority.

**Nelson Bailey** for Timothy Gibson.

## OPINION OF THE COURT

CARL H. HARPER, Circuit Judge.

The defendant's Motion to Suppress Confession and Admissions was filed on October 10, 1984. It came on for lengthy evidentiary hearings on November 8, 1984 and November 20, 1984. The court heard the

testimony of the witnesses called by the respective parties, received certain exhibits in evidence and heard the arguments of counsel. Because of the protracted nature of the hearings and the importance of the legal issues involved, considering the gravity of the criminal charges filed against the defendant, the motion was taken under advisement pending receipt of memoranda of law and legal research by the court. Since the hearing, this court has received the memoranda filed in support of the motion by defendant's counsel on November 8, 1984, November 20, 1984 and December 7, 1984. The State did not file opposing memorandum, but furnished the court with copies of the six cases on which it relies, namely *Burch v. State*, 343 So.2d 831 (Fla. 1977); *In Interest of W.J.N.*, 350 So.2d 119 (Fla. 4th DCA 1977); *Barnason v. State*, 371 So.2d 680 (Fla. 3rd DCA 1979); *Doerr v. State*, 383 So.2d 905 (Fla. 1980); *Villar v. State*, 441 So.2d 1181 (Fla. 4th DCA 1983); and *State v. Cartwright*, 448 So.2d 1049 (Fla. 4th DCA 1984). This court has spent many hours doing its own research in preparation of this exceptionally long written order. Based on the totality of the circumstances surrounding the defendant's statements and the evidence presented, this court is compelled to grant the motion for the reasons set forth hereinafter.[1]

## FINDINGS OF FACT

### Summary of videotapes:

Clyde Woods, along with Timothy Gibson and Christopher Dority, is charged with four of the most serious crimes in our law, namely first degree murder; burglary of a dwelling; sexual battery upon a victim helpless to resist; and kidnapping. The crimes are alleged to have been committed between January 29, 1984 and February 3, 1984. The victim of all four crimes was a seventy-one year old woman who lived at 1404 Skees Road in Palm Beach County.

On February 3, 1984, after the victim's body had been discovered in her home, Detective Rick Jenkins of Palm Beach County Sheriff's Office canvassed the neighborhood for possible witnesses, but did not enter the victim's home. It was on this occasion that Jenkins first encountered Clyde Woods and his widowed father, Claude Woods, who lived nearby. Neither of them claimed to have any information regarding the crimes. No witnesses to the crime were located. The

---

[1] To admit the defendant's statements in evidence, even with the cautionary instruction that the statements should be disregarded if the jury found them to be involuntarily made, would be like throwing a wild skunk in the laps of jurors and telling them to disregard the smell.

154

crime scene was processed, but no tangible evidence was found that could lead to the identity of anyone involved in the crimes.

On February 4, 1984, Jenkins returned to the scene, entering the victim's home which he described as being "untidy", with magazines and newspapers stacked about. He observed a Playboy magazine, but did not consider it to be significant at that time. Later on, Jenkins attended a seminar on sex crimes. Based on the information he learned at the seminar, Jenkins then began to suspect that the Playboy magazine might be significant evidence of a sexual battery upon the homicide victim. However, as noted hereinafter, Jenkins knew that there was not a scintilla of evidence found at the crime scene or during the autopsy performed on the victim that would indicate that a sexual battery had occurred. See those portions of the deposition testimony of Dr. John V. Marraccini, Associate Medical Examiner for Palm Beach County, stipulated into evidence.

On July 23, 1984, Jenkins somehow came to interview this defendant's half-brother, Timothy Gibson, and obtained his recorded "confession" to the crimes charged herein. The interview lasted several hours. According to Jenkins, Gibson named Shawn Barlow, James Anderson and Larry Krego as his confederates in the crimes. He could not recall if Gibson stated that someone named St. Clair was also involved. In any event, according to the testimony of Jenkins, Gibson did not on that occasion name either Clyde Woods or Christopher Dority as being involved. In fact, Gibson specifically denied that Woods was involved, according to Jenkins. It should be noted that Gibson's statements have not been presented to this court and the contents thereof are unknown to this court except as noted herein. According to Jenkins, he eliminated Barlow, Anderson and Krego as suspects when Gibson changed his statement and named Woods and Dority instead.

After obtaining Gibson's statement, Jenkins went to the Juvenile Detention Center on July 23, 1984 to speak with the codefendant, Christopher Dority. Apparently, Dority was in detention for some other unrelated offense. Dority refused to be interviewed. However, Jenkins again visited Dority later that day at the detention center where he was interviewed for some 4 to 5 hours. According to Jenkins, Dority gave a tape recorded "confession" to the crimes charged herein and named Timothy Gibson as his confederate. Dority did not at that time implicate this defendant, Clyde Woods, according to the testimony of Jenkins. Later that same date, July 23, 1984, Jenkins again visited Dority at the detention center where a second interview was conducted (and presumably recorded). He specifically asked Dority if

**155**

Clyde Woods was also involved in the crimes charged, to which Dority replied that he was. It should be noted that the Dority statements have not been presented to this court and the contents thereof are unknown to this court as noted herein.

On the morning of July 24, 1984, Jenkins took Gibson (who was then in custody on the instant charges) back to the crime scene to videotape a reenactment of the crimes. By happenstance, Clyde Woods came by on his bicycle, accompanied by his four year old brother and his cousin, Arthur Hoffman III, age 17 years. Seeing his half-brother in handcuffs and in jail garb, Woods attempted to speak with Gibson, but was not permitted to do so. Instead, Jenkins asked Woods if he would accompany him to the Sheriff's Office so that he could speak with him. It is uncontradicted that Jenkins advised Woods that he did not have to do so. Woods voluntarily accepted and immediately rode with Jenkins to headquarters. His four year old brother was left in the company of Hoffman who testified that some officer told him that Woods would return in about one-half hour.

Upon arrival at the Sheriff's Office at about 11:00 a.m., Woods was placed in a small, air conditioned interview room which is equipped with a videotape camera concealed in the ceiling. Woods was placed in a chair located in a corner of the room at the end of a table. He was clad only in cut-off trousers and was barefooted. At about 11:10 a.m., Jenkins began a conversation with Woods after advising him of his constitutional rights from a standard Miranda rights card. See State's exhibit 4 in evidence by stipulation. Woods acknowledged that he understood those rights given to him by Jenkins. The acknowledgement was not witnessed by two witnesses, but by Jenkins alone. The entire conversation was videotaped (both audio and visual) without the knowledge and consent of Woods. The conversation lasted until about 1:45 p.m., for a total of about two hours and thirty-five minutes with a few brief respites for the convenience of the interrogating officers, Detective Jenkins, Detective Jack Strenges and Sergeant John Cerbone. During these respites, Woods remained in the interview room continuously without leaving his chair for any reason. The videotapes (two tapes) of the conversation were received in evidence without objection and viewed by this court in their entirety. See State's exhibits 1 and 2 in evidence. Also, a typewritten transcript of the videotaped conversation was received in evidence without objection. See State's exhibit 6 in evidence consisting of 86 typewritten pages. However, it should be pointed out that the transcript contains numerous material omissions and misstatements when compared to the videotapes in evidence.

The videotapes are in evidence and constitute the best evidence of

156

what was said and the circumstances in which it was said. Jenkins did not ask Woods if he wanted an attorney or if he wished to make a statement. When the videotapes and transcript are carefully analyzed, it is clear that Woods said very few words except to deny his involvement in the crimes charged and to persist in his innocence. In reality, the videotapes consisted almost entirely of accusatorial and argumentative statements by Jenkins, Strenges and Cerbone. Jenkins did not tell Woods he was a suspect in the crimes charged prior to the Miranda card being read to him. He merely stated "anytime we take a statement from anybody we always read them their rights like on television". See State's exhibit 1 (videotape) and page 3 of State's exhibit 6 (transcript). A detailed summary of the conversation must be given in order to highlight the outrageous and shameful brainwash interrogation that followed. It was only after Woods had signed the Miranda card, acknowledging that he understood his rights, that Jenkins first informed him that Gibson and Dority had confessed and implicated him in the crimes charged. See page 5 of the transcript. Soon after Woods replied "they're lying", Jenkins told Woods he was going to be arrested. See pages 8 and 10 of the transcript. Shortly thereafter, Jenkins informed Woods "you're under arrest for murder". See page 12 of the transcript. It is undisputed that Jenkins did not have an arrest warrant for Woods at that time.

From that point on, Jenkins continued his accusatorial statements, pleading with the defendant to confess. Jenkins repeatedly told Woods that he could prove that he was guilty because his fingerprints, saliva, semen, and hair samples had been found at the crime scene, all of which Jenkins knew were blatantly false. Furthermore, Jenkins repeatedly told Woods that Gibson and Dority had both agreed to testify against him and had taken polygraph tests which they passed, both of which Jenkins knew were blatantly false. Nevertheless, Woods continued to deny his involvement and persisted in his innocence. On more than one occasion, Woods offered to take a polygraph test which was denied to him by Jenkins.

Throughout the interrogation, Jenkins repeatedly placed his hands on different parts of the defendant's body, insisting that Woods look at him and listen to him. He repeatedly told Woods that if he did not confess that he could not help him; that the jury would believe Gibson and Dority and would not believe Woods; that unless he made a statement, the judge and jury would find him guilty of murder and give him the death penalty; and that if he made a statement he could save his life. At one point, Jenkins raised his arms and tearfully said "God, don't do this to yourself". See page 25 of the transcript. He repeatedly

**157**

told the defendant that he would be insulting the jury's intelligence if he said "I didn't do it". Shortly thereafter, Jenkins left the interview room to give Woods "a minute or two to think about it". He returned in about ten minutes, accompanied by Strenges and the interrogation resumed.

A brief excerpt of Dority's taped statement was played to Woods. Thereupon, Jenkins told Woods that he was not going home because he was going to be charged, and that Gibson and Dority are going to testify; and that "unless you give us something to work with, we can't help you at all". See page 27 of the transcript. When Strenges asked the defendant why he was shivering, he replied "because I'm cold". See page 28 of the transcript. Nevertheless, the air conditioning was not adjusted. Jenkins and Strenges were comfortably clothed. Jenkins continued with his accusatorial technique, repeatedly pleading with Woods to make a statement; that unless he did so "people would think he was a devil or animal loose among them, and it would be a slap in the face to the jury and to your family who will say there's been a monster living in my house, a crazy man". Jenkins added "we're here to help you". See pages 29-30 of the transcript. Jenkins told Woods "the hardest sentences I've ever seen come on people who say it didn't happen, it never happened". See page 32 of the transcript. Jenkins told Woods "you know we can't promise you anything, you know that, but we're here to help you, we're here to be fair . . . you're going to be charged with first degree murder . . . but you know there's a big difference when a person makes a clean break of it and says, sure I made a mistake". He suggested to Woods that "people have a natural curiosity about the dead. It isn't any big deal . . . I think things got out of hand and Mrs. Bruno can be a scary lady . . . she yelled and screamed and she probably tried to hurt you". See pages 33-34 of the transcript. Jenkins further suggested to Woods "you guys had to protect yourselves, I know that's probably what happened, but I can't say it on the tape unless you tell me about it" and "there are no guarantees if you keep your mouth shut and go to trial on this". See page 35 of the transcript. Jenkins informed Woods that unless we made a statement that he would have to put in his report that Woods was "arrogant, smart-mouthed and uncooperative", and that "if you don't talk to us it's going to be like you intentionally set out to kill Mrs. Bruno". See pages 36-38 of the transcript. Shortly thereafter, Jenkins left the room, but Strenges continued the interrogation. Strenges told Woods "you have to tell what you know because we're going to help you". See page 40 of the transcript. He also suggested to Woods that "Jesus and God would punish him" if he did not cooperate, that he

should "give himself a second chance because you're sending yourself to an early grave". See pages 41-42 of the transcript. He informed Woods that neither he nor Jenkins were "going to go away, its going to get worse . . . we want to help you, we're giving you a second chance." See pages 43-44 of the transcript. Thereupon, Strenges left the interview room and Jenkins reentered to continue the interrogation.

Jenkins then played another brief excerpt of the tape statement of Dority. He pleaded with Woods to tell his side of it and "don't make that be played in front of the jury". He said "if I go to court like that and I have to tell them that when confronted with the evidence you still denied it, you still refused to tell me how it happened, you didn't even offer any defense, they'll think you're some kind of bad guy, but you're not". See pages 47-50 of the transcript. Jenkins then began to tell Woods that he would be hurting his father and his deceased mother if he continued to say "I didn't do it". He also told Woods "at this moment in your life I'm the most important person in the world to you. I'm the only person who can help you in the world. You've got to help me help you . . . you're like a drowning man. I'm throwing you a life preserver and you're not grabbing it". See pages 53-55 of the transcript. Shortly thereafter Jenkins left the room for about four minutes, leaving Woods in the room alone.

Upon returning to the room, Jenkins then played a brief excerpt of Gibson's taped statement. Nevertheless, Woods continued to persist in his innocence. Shortly thereafter, Officer Strenges reentered the room. He stood over Woods with is finger in his face, calling Woods a "little hard-ass", saying "you want to be a bad guy, you want to be another Jesse James", but "we're trying to help you". See pages 63-65 of the transcript. Thereafter, Strenges left the room, and Jenkins continued the interrogation.

Jenkins suggested to Woods that if he admitted to being in the victim's house "the jury would have a doubt in their minds" as to what Gibson and Dority said in their statements. Again he told Woods that Gibson and Dority were ready to testify, and that Woods was "burying himself" by saying he wasn't in the house. See pages 66-67 of the transcript. At about this point, Jenkins pulled the defendant's hand down from his head, pushed him on his chest and grabbed him by both shoulders, as the first videotape concluded.

State's exhibit 2 (the second videotape) then began. Jenkins continued his interrogation of Woods, suggesting that he was merely a lookout for Gibson and Dority. Nevertheless, Woods persisted in his innocence. Shortly thereafter, Jenkins left the room for about two

**159**

minutes. Upon his return, Jenkins told Woods that he would protect him against his father's discipline if he gave a statement. See page 70 of the transcript. At this point, Sergeant Cerbone entered the room and Jenkins left.

Cerbone told Woods that he was going to be arrested and that the charge would depend on what Woods told him. He explained the various degrees of crimes that could be filed and the penalties involved. He told Woods that it looked like he would be charged with "premeditated murder because you're not telling us anything" and "I guarantee you if you walk out of this door right now without telling them the truth, we can't speak for you. The only thing we can do is arrest you and charge you with the worst"; and that "you need our help". See pages 72-73 of the transcript. Cerbone asked Woods if he knew what would happen if he took a polygraph test, to which Woods replied "I ain't lying to you, sir". Cerbone told Woods "I'm not going to say please to you, son. I really don't give a shit" and "I'm going to go for the first degree murder on you because you're not cooperative at all". See pages 74-75 of the transcript. Cerbone again told Woods that he was going to be arrested because he was not being cooperative, asking him what charge he wanted to be arrested for, telling Woods he had a choice depending on what he told them. Cerbone told Woods that since Gibson and Dority had been cooperative, he was going to testify on their behalf and that he would do the same for Woods if he cooperated. See pages 79-80 of the transcript. However, Woods continued to deny his involvement and persisted in his innocence. Cerbone then said to Woods "okay, you're denying that you were in the house, you're denying that you were with them—you're being charged with murder . . . you got the bullet". See pages 81 and 86 of the transcript. Cerbone again told Woods that he was going to help Gibson and Dority because of their cooperation, and that he (Woods) "needed someone in his corner to help him as well". Again Woods denied his involvement and persisted in his innocence. See pages 83-84 of the transcript. The interrogation concluded as Cerbone falsely told Woods that Gibson had taken a polygraph test and passed, asking Woods if he had taken the test. Woods replied "I'll take one". Cerbone then stated "for what, so you fail it and lie. You can't pass those things". See page 86 of the transcript. (Ironically, Woods did thereafter take two polygraph tests, in October and November, 1984, conducted by Robbie Bronson who testified in a proffer that Woods passed the test questions, and that Woods was truthful when he denied his involvement in the crimes charged. Bronson is a qualified polygraph examiner who Jenkins had stated that he would believe.) Shortly after the interrogation ended

160

about 1:45 p.m., Woods was removed from the interview room and placed in a nearby holding cell. He was not taken to the county jail or to the juvenile detention center.

At about 2:00 p.m. that same day, the defendant's father arrived at the Sheriff's Office. Jenkins told him that his son was under arrest and reviewed the facts with the defendant's father. Shortly thereafter, the father had two private conversations with the defendant in Cerbone's office. The conversations were not monitored. Woods was thereafter returned to the holding cell where he remained until about 4:15 p.m. when he was taken into the aforementioned interview room for another interview by Jenkins. The interview began at 4:15 p.m. and concluded at 5:45 p.m., a total of 90 minutes. No one was present in the interview room other than Jenkins and Woods. The entire conversation was videotaped without the knowledge and consent of Woods. The videotape was received in evidence without objection and was viewed by the . court in its entirety. See State's exhibit 3 in evidence. Also, a transcript thereof consisting of 65 typewritten pages was received in evidence without objection and was read by the court. See State's exhibit 7 in evidence. Woods was still scantily clad as before and was seated in the same location as in the earlier interrogation. Woods complained "it's cold" to which Jenkins replied, "it takes a while for the air conditioning to shut off". See page 8 of the transcript, State's exhibit 7 in evidence.

Jenkins began the interrogation by again reading a standard Miranda rights card to Woods. Woods verbally acknowledged that he understood his rights and signed the card. See State's exhibit 5 in evidence. As before, Jenkins was the only witness to the signature at the time the card was signed. Of course, at this time Woods knew that he was a suspect because he had already been accused and formally arrested by Jenkins. Jenkins did not expressly ask Woods if he wished to have an attorney or make a statement. Although the videotape and transcript are in evidence and speak for themselves, a detailed summary of the contents thereof is appropriate.

Just as Woods began his statement, Jenkins stated to him "now, I'm having a real problem hearing you, okay". Woods responded by asking "is that your hearing or are you taping this". Jenkins again lied to Woods by saying, "no, that's my hearing. I have a hearing problem in my right ear, because half the time I can't hear you". See page 4 of the transcript. Woods then proceeded, in question and answer form, to admit to his involvement in the crimes charged. He admitted that he had entered the victim's home and helped bind her up with duct tape after which he exited the home to serve as a "lookout" while Gibson

**161**

and Dority ransacked the home. Woods drew a rough diagram of the victim's home at the request of Jenkins, including a fence and gate. Woods was uncertain as to how to spell the word "gate". See page 26 of the transcript. It should be noted, however, that the diagram was not presented in evidence and was not depicted in the videotape, and this court has not seen it. No testimony was given as to its accuracy. As Woods completed the diagram, Jenkins told him, "Buddy, you're doing real good, I'm glad that you finally realized it's important that you help yourself and I want you to understand part of helping yourself is being completely truthful because being a little bit truthful doesn't help that much".

Jenkins then began to prod Woods with leading questions about details, repeatedly urging Woods to search his memory and to "help yourself". See for example pages 30-32 and 36-37. This led Woods to admit that Gibson and Dority had sex with the victim, but he denied having done so. As Jenkins continued the interrogation, Woods asked to go to the bathroom. However, Jenkins asked him "can you hold it for just a second". Woods replied "yeah". See page 39 of the transcript. (As will be noted hereinafter, it was some 30 minutes later that Woods was permitted to relieve himself. See page 49 of the transcript). Jenkins told Woods it was no "big deal to have sex with dead people", and suggested to Woods that he had been cajoled or "pushed" into doing so by Gibson and Dority. See page 40-44 of the transcript. When Woods persisted in denying that he had sex with the victim, Jenkins countered by telling Woods, "okay, you don't want Chris and you don't want Tim to go in there in court and tell the judge and jury that you had sex. And you don't want to go in there and say, no I didn't. I know you don't, not after you've done so good. You're doing so good. Now, tell me the truth, son, you had sex with her, didn't you". See page 45 of the transcript. However, Woods remained steadfast in his denial. Jenkins then briefly shifted the conversation to other matters concerning the burglary, telling Woods "taking something from the house is no big deal". Shortly thereafter, Jenkins asked Woods if he still had to go to the bathroom "pretty bad now or what". Woods said "yeah". At that time, Jenkins asked Woods a series of questions, "have I treated you nice; have I threatened you or been mean to you; have I been nice to you; have I promised you anything or anything like that". When Woods gave favorable answers, Jenkins said, "okay, I'm going to take you to the bathroom then we'll come back here and talk a little bit more". See pages 48-49 of the transcript. He then took Woods to the bathroom. The interrogation resumed when they returned from the bathroom.

Jenkins changed the conversation back to whether Woods had sex with the victim. Again Woods denied that he had. Jenkins responded by saying, "come on Bud, you know that the more you help—I don't have to go through that routine again. You know that the more you help yourself the more we help you, you know very well that your story should match their story, you know that". See page 52 of the transcript. When Woods persisted in his denial, Jenkins countered by saying "I know you had sex with her, I can prove it, that isn't any big deal, it isn't any big deal . . . Mrs. Bruno was dead when this was going on . . . the jury will get a big laugh out of it . . . Mrs. Bruno, she couldn't have felt anything, she wouldn't have known what was going on and young guys have a need to have sex, am I right or wrong", during which statements Jenkins was holding Woods by his shoulders and arm. See pages 53-54 of the transcript. Nevertheless, Woods persisted in his denial of sex with the victim. Jenkins told Woods that "scientists and laboratory people are smart enough to know what penis went into what vagina . . . I'm not playing games with you . . . but you're not helping yourself all the way because I can't go into court and say you were truthful all the way. Please, let me do that, tell the truth about it. If the other guys kidded you or forced you into it, just tell me". See pages 56-58 of the transcript. Woods then admitted that he had been forced to have vaginal sex with the victim. He stated that he had gotten an erection when he looked at the Playboy magazine. See pages 58-64 of the transcript. The conversation concluded by Woods answering Jenkin's questions, saying that he had been treated fairly like a friend, without any threats or promises. See page 65 of the transcript. The court will now summarize the testimony of the witnesses who testified at the evidentiary hearings.

*Summary of testimony*:

Jenkins was the first witness called by the State and was on the witness stand when all the videotapes were played to the court. Before the first videotape was played, Jenkins briefly testified that when he saw Woods on July 24, 1984 during the videotape reenactment, he approached Woods, identified himself and asked Woods to accompany him to headquarters. He testified that at that time he had already taken a statement from Gibson implicating Woods. Jenkins did not testify as to the contents of Gibson's statement. The first two videotapes were then played to the court in the presence of Jenkins. Before the third videotape was played to the court, Jenkins briefly testified that after Woods had been placed in the holding cell that his father urged Woods to "cooperate with us". Jenkins gave hearsay testimony to the effect

that the defendant then asked Jenkins' captain to arrange for him to talk with Jenkins again. The third videotape was then played to the court in the presence of Jenkins, concluding the hearing at 4:30 p.m. at which time the court recessed. Cross-examination of Jenkins was reserved.

The hearing resumed on November 20, 1984. Jenkins testified on lengthy cross-examination that he "interviewed" Woods, but did not "interrogate" him against department policy. He testified that "an interview is a search for the truth, whereas an interrogation is something done years ago under psychological stress". He testified that "there is no difference in interviewing juveniles and adults, in spite of what the law says; I treat juveniles the same as adults; I change my style during an interview, depending on whether a suspect is forthright; and that the interview will continue unless a suspect invokes his Fifth Amendment right by saying I don't want to talk or I want an attorney". Jenkins testified that when Woods said "I ain't saying nothing" (page 17 of the transcript, State's exhibit 6), Woods was not invoking his right to remain silent.

Jenkins could not describe the size of the interview room concealing the videotape camera. He testified that the room was not cold. He admitted lying to Woods when he led him to believe the air conditioner had been adjusted. He admitted that he lied to Woods about the interview not being taped; that he lied to Woods about Gibson and Dority having passed a polygraph test; that he lied to Woods about Gibson and Dority agreeing to testify against him; and that he lied to Woods about his fingerprints, semen, saliva and hair having been found in the victim's home. He admitted that no evidence of a sex crime was found at the scene or during Dr. Marracinni's autopsy on the victim. See also those portions of Dr. Marracinni's deposition stipulated into evidence, confirming the absence of such evidence. Jenkins acknowledged that he told Woods many times that he would "help him" if he confessed, and that he touched Woods numerous times to "reassure him that he could tell the truth, as part of my interview technique". Jenkins denied having used physical force, saying he used his "muscular strength to have Woods sit in a certain fashion".

Jenkins testified that since he had no independent eyewitnesses and no physical evidence linking anyone to the crimes, the only way he could solve the crimes was by obtaining confessions. He testified that Strenges and Captain Kersey told him before his initial interview of Woods that he had probable cause to arrest Woods, that it had been cleared by the State Attorney's office; and that he was going to arrest Woods in any event. However, Jenkins gave confusing or conflicting

**164**

testimony concerning his probable cause. On the one hand, Jenkins testified that on the morning of July 24, 1984 when he arrested Woods, the only probable cause he had was the statement of Dority implicating Woods. However, he had earlier testified that Gibson had also implicated Woods in his statement. In any event, Jenkins testified that both Gibson and Dority had given conflicting statements concerning who was involved with them and that both had stated that Woods was not implicated with them.

Jenkins testified that Woods was permitted to speak with his father before he was placed in the holding cell prior to giving his confession. Jenkins testified that he too spoke with the defendant's father prior to the last interview. He told the father that if Woods confessed he would "wind up just being a witness". Jenkins concluded his testimony by saying the defendant's father spoke with Woods in Cerbone's office about 15 minutes, and came out saying, "my son says he didn't do it and I believe him". The defendant was placed in the holding cell, after which Captain Kersey told Jenkins that the defendant wanted to speak with him again. The confession followed. Jenkins acknowledged that from 11:00 a.m. to about 7:00 p.m., during which time Woods was being interviewed and held in the holding cell, that Woods was given nothing to eat or drink.

Richard Oetinger, deputy sheriff of Palm Beach County, testified that at about 6:30 to 7:00 p.m. on July 24, 1984 he was in a conference room completing paper work on an unrelated homicide case. Woods was placed in the room with him alone while the other officers completed their paper work on the instant case. Oetinger testified that Woods was upset and almost crying. He could not recall how Woods was dressed, except that he was not in handcuffs. Oetinger testified that Woods spontaneously volunteered that Gibson had tied Bruno up with duct tape, breaking her arm, and that Gibson and Dority forced him to have sex with her. Oetinger testified that he then asked Woods "was she dead when you had sex", to which Woods replied "I don't know". Oetinger testified he then completed his paper work without further conversation. He estimated that he and Woods had been in the room together about 30-45 minutes when Jenkins removed Woods from the room. Apparently, this conversation was not electronically recorded or monitored. On cross-examination, Oetinger testified that he did not read a Miranda rights card to Woods. He further testified that he did not make a written report of his brief conversation with Woods; did not report the conversation to Jenkins; that he did not know anything about the conversation Jenkins had with Woods; and that he had not seen the videotapes.

**165**

The first witness called by the defense was Dr. David N. Bortnick, a self-employed clinical psychologist. The State stipulated to his expertise. Dr. Bortnick testified that he examined Woods on October 22, 1984 and administered the Wechsler Intelligence Scale for Children; the Wide Range Achievement Test; Hand Test; and Psychological Screen Inventory on Woods. As a result, he determined that Woods has a verbal IQ of 67 (mentally defective); a performance IQ of 86 (low average); and a full scale IQ of 74 which places his overall level of intelligence within the borderline range at the fourth percentile when compared to other persons the age of Woods. According to Dr. Bortnick, Woods has the reading skills of a child aged 5 years, 7 months. Dr. Bortnick testified that he also had viewed the five hour videotaped statements summarized herein. He prepared a written report of his examination and findings. The written report was received in evidence without objection as defendant's exhibit 2. Dr. Bortnick testified that while Woods probably had a superficial understanding of his Miranda rights, he doubted that Woods understood his rights; that Woods had in his own way attempted to stop the interrogation; and that the videotaped statements were the product of manipulation and coercion.

Dr. McKinley Cheshire, psychiatrist, then testified. The State stipulated to his expertise. Dr. Cheshire testified that he never examined Woods, but he did personally view the videotapes summarized above and reviewed Dr. Bortnick's written report. Dr. Cheshire testified that in his opinion Woods did not voluntarily waive his Miranda rights and that his videotaped statement were not freely and voluntarily given, but were induced by "P.O.W. brainwashing techniques" which he outlined.

Robbie Bronson, the polygraph examiner referred to hereinabove, then testified on a proffer. He testified that he gave Woods two different polygraph exams, one on October 21, 1984 and the other on November 2, 1984. In the first test, he asked Woods, "do you know for sure who tied up Bruno"; "did you murder Bruno"; "did you in any way help put duct tape on Bruno"; and "were you inside Bruno's house when she was tied up", to each of which Woods truthfully answered "no". In the second test, he asked Woods "are you lying about not being in the house when Bruno was killed"; "did you murder Bruno"; "did you touch Bruno while she was being tied up"; and "were you in Bruno's house when she was tied up", to each of which Woods again truthfully answered "no". However, it should be pointed out that this court heard this testimony only as a proffer and gives the testimony no weight or probative value in support of this order.

Arthur Hoffman III, age 17 years, then testified briefly that he was

**166**

with Woods and his 4 year old brother, Winston, on July 24, 1984 when Jenkins asked Woods to accompany him to the Sheriff's Office. Hoffman testified that some officer told him that Woods would be back in about 30 minutes.

Claude Woods, the defendant's father then testified. He is a heavy equipment operator, presently unemployed. He testified that on July 24, 1984, he was on the job site in Sandalwood Cove, Boca Raton, when he received a call from his union that his son, Clyde Woods, had been arrested for murder and for him to come to the Sheriff's office. He arrived at the Sheriff's office shortly after 2:00 p.m. He testified that Jenkins invited him upstairs where Jenkins told him that his son was "belligerent and uncooperative". Mr. Woods testified that Jenkins asked him to talk with his son and said "if he confesses, it may be possible he could be used as a witness later". Mr. Woods then spoke with his son in an office where "he came down hard on him", according to his testimony. When Mr. Woods told Jenkins that his son denied any involvement, Jenkins asked Mr. Woods to speak with his son again. Mr. Woods complied, but to no avail. Mr. Woods testified that he was not sure if he told his son that if he confessed that he would be used as a witness later.

The last witness to testify was the defendant, Clyde Woods. He testified that he turned 15 years of age on November 4, 1984 and is presently in the 7th grade, having failed the 3rd and 7th grades. He testified that on July 24, 1984, when he saw Gibson in jail clothes and handcuffed, he attempted to find out what was happening. He testified that Jenkins told him "come on down to the station and I'll give you some details". Woods testified that he did not know that he was a suspect at that time. He testified that upon arrival at the Sheriff's office, he was placed in a room where he was read his rights from a card. He did not see the hidden television camera. He testified that Jenkins then accused him, at which point he "felt bad because I wasn't there" and that he tried to stop the conversation. He said that he was very cold and shivering, and was afraid that Jenkins was going to hit him when Jenkins grabbed his neck and arm. He testified that he also thought Strenges would hit him when Strenges jumped up and pointed his finger in his face. Woods said he was "scared of them; but that he believed they would let me go if I told them I did it". Woods testified that it hurt him when "Jenkins seemed to put my mother down". He said he told Jenkins to "arrest me so he would leave me alone, thinking he would stop". He testified that he was then placed in the holding cell where he remained from 30 to 60 minutes, "crying because I was charged with murder".

**167**

Woods testified that while he was in the holding cell he was approached by two detectives, one a "Captain wearing a white shirt". He testified the captain told you "you're making it hard on yourself not telling the truth", and the other asking the Captain "shall I take him over to jail", the Captain replying "wait a couple more minutes", and telling Woods "why don't you go back and tell Jenkins the truth". He acknowledged that he spoke with his father twice in an office where his father asked him "did you do it", to which he responded "no". Woods testified that he did not ask to speak with Jenkins again, but he acknowledged that he did eventually "go back in the room and tell Jenkins what I thought he wanted to hear." This concluded the testimony.

## CONCLUSIONS OF LAW

Juvenile confessions have always been held to be admissible, though the courts have necessarily regarded them with closer scrutiny because of the age of the person involved. See *Doerr v. State*, 348 So.2d 938 (Fla. 2d DCA 1977) approved in 383 So.2d 905 (Fla. 1980); *T.B. v. State*, 306 So.2d 183 (Fla. 2d DCA 1975) and *State v. Francois*, 197 So.2d 492 (Fla. 1967). The admissibility of a juvenile's confession must be determined by the totality of the circumstances under which it was made. *Gallegos v. Colorado*, 82 S.Ct. 1209 (1962). Therefore, clearly a minor has the capacity to make a voluntary confession, even of capital offenses, without the presence or consent of counsel or other responsible adult. The admissibility of such a confession depends not on his age alone but on a combination of that factor with such other circumstances as his intelligence, education, experience, and ability to comprehend the meaning and effect of his statement; but if the confession stems from custodial interrogation, the defendant must also be given his Miranda rights. The State has the heavy burden to show that the defendant voluntarily, knowingly and intelligently waived those rights. See *Tague v. Louisiana*, 100 S.Ct. 652 (1980); *T.B. v. State*, 306 So.2d 183 (Fla. 2d DCA 1975); *Tennell v. State*, 348 So.2d 937 (Fla. 2d DCA 1977); *Hall v. State*, 421 So.2d 571 (Fla. 3rd DCA 1982); and *Arnold v. State*, 265 So.2d 64 (Fla. 3rd DCA 1972). The quantum of proof the State must meet is by a preponderance of the evidence. *Brewer v. State*, 386 So.2d 232 (Fla. 1980).

Where a mentally competent and aware defendant has been given his appropriate Miranda rights and has not been placed in fear of material or physical harm or given hope of material reward, the interrogating officers may use methods of interrogation psychologically effective to break down the defendant's will not to confess. *Barnason v. State*, 371

So.2d 680 (Fla. 3rd DCA 1979). See for example the interrogation technique used in *Burch v. State*, 343 So.2d 831 (Fla. 1977). But compare *DeConingh v. State*, 433 So.2d 501 (Fla. 1983), where it was held that the confession was the product of psychological coercion rather than of free intellect. If the confession is extracted by any sort of threat or violence, or is obtained by any sort of direct or implied promise, however slight, or by the exertion of any improper influence, it must be suppressed as invalid even though Miranda warnings were given. *M.D.B. v. State*, 311 So.2d 399 (Fla. 4th DCA 1975). Furthermore, where the interrogating officers employ two or more courses of conduct against a defendant in their interrogation, using lies, threats and promises of leniency, the confession must be suppressed as involuntary, as an unconstitutional abridgement of the defendant's Fifth Amendment and due process rights. *Williams v. State*, 441 So.2d 653 (Fla. 3rd DCA 1983). The more immature the juvenile may be, the greater likelihood exists that his confession will be deemed inadmissible. The fact that a juvenile's confession was given before he had the opportunity to talk with his parents or an attorney is certainly a factor militating against its admissibility, but does not preclude a finding of voluntariness depending on all the other circumstances surrounding the confession. *Doer v. State*, supra.

The parental notification requirement of section 39.03(3)(a), Florida Statutes, applies only to detention or shelter care and not to police interrogtion. See *In Interest of W.J.N*, 350 So.2d 119 (Fla. 4th DCA 1977); *Batch v. State*, 405 So.2d 302 (Fla. 4th DCA 1981); *Villar v. State*, 441 So.2d 1181 (Fla. 4th DCA 1983); and *State v. Cartwright*, 448 So.2d 1049 (Fla. 4th DCA 1984). Likewise, Rule 8.290(d)(4), Rules of Juvenile Procedure, which provides:

> "A waiver of counsel made in court shall be of record; a waiver made out of court shall be in writing with not less than two attesting witnesses. Said witnesses shall attest the voluntary execution thereof"

applies only to procedures in the circuit court (juvenile court) and not to police interrogation. See *State v. Cartwright*, supra at page 1051, citing *Jordan v. State*, 334 So.2d 589 (Fla. 1976) and *In re H.D.*, 443 So.2d 410 (Fla. 4th DCA 1984), but acknowledging conflict with *S.L.W. v. State*, 445 So.2d 586 (Fla. 1st DCA 1983) which cited *M.L.H. v. State*, 399 So.2d 13 (Fla. 1st DCA 1981). This court is required to follow the decisions of the Fourth District Court of Appeal pursuant to *State v. Hayes*, 333 So.2d 51 (Fla. 4th DCA 1976). Therefore, this court finds that the failure of the interrogating officers to notify this juvenile's parent before the initial interrogation contained in the first two videotapes and their failure to have two witnesses attest

to the voluntariness of his waiver of counsel does not per se render any of his statements involuntary.

Nevertheless, based on the totality of all the circumstances detailed above, this court finds that the State has failed in its burden to show by a preponderance of the evidence that Clyde Woods made his statements voluntarily, knowingly and intelligently. No reasonable jurist who truly believes in the Constitution could find otherwise. Therefore, the defendant's three videotaped statements and the oral statement to officer Oetinger are suppressed for the following joint and alternative reasons:

1. Although Woods voluntarily accompanied Jenkins to the Sheriff's Office on July 24, 1984, his warrantless arrest shortly thereafter and prolonged detention was unlawful. If Jenkins had any probable cause to arrest the defendant, no factual evidence thereof was ever presented to this court from which an independent finding of probable cause could be made. His testimony that his probable cause was based on the statements of Gibson and Dority was nothing more than a subjective conclusion by Jenkins. Even assuming that Gibson and Dority had told Jenkins that Clyde Woods was a willing participant in the crimes charged, their statements were untrustworthy. By his own testimony, Jenkins stated that both Gibson and Dority had given contradictory statements concerning the involvement of Woods. No neutral magistrate worth his salt would have issued an arrest warrant for Woods based on such contradictory, untrustworthy probable cause, absent some other reliable corroborating evidence. The warrantless arrest of the defendant without probable cause amounted to an unconstitutional Fourth Amendment seizure of his person, and there was an unbroken causal chain between the unconstitutional seizure of the defendant and his statements. See *Dunaway v. New York*, 99 S.Ct. 2248 (1979), and compare *State v. Dodd*, 396 So.2d 1205 (Fla. 3rd DCA 1981) approved and remanded in 419 So.2d 333 (Fla. 1982). The videotaped statements and the spontaneous oral statement to Oetinger were the tainted products of the unlawful seizure. They must be suppressed as the fruits of the poisoned tree. *Wong Sun v. United States*, 83 S.Ct. 407 (1963). The giving of Miranda warnings after the illegal arrest did not dissipate the taint. *Brown v. Illinois*, 95 S.Ct. 2254 (1975). Likewise, allowing the defendant's father to speak with the defendant was not a break in chain of causal events sufficient to dissipate the taint of the illegal arrest and detention.

2. Even if the initial arrest of the defendant had been lawful, the defendant did not knowingly and intelligently waive his Fifth Amendment right to remain silent. On the contrary, Woods tried in his own

170

inarticulate, immature way to remain silent when he said on the videotape (State's exhibit 1), "Just like the card said, I ain't saying nothing" and when he said "arrest me or let me go home". See for example *Bowen v. State*, 404 So.2d 145 (Fla. 2d DCA 1981). If a defendant *indicates in any manner*, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease—the critical safeguard is a person's "right to cut off questioning". *State v. Dixon*, 348 So.2d 333 (Fla. 2d DCA 1977).

3. Even if the initial arrest had been lawful and even if Woods had voluntarily waived his right to silence, his statements were not the product of his free will and intellect, but rather were induced by countless promises, lies and threats, amounting to psychological coercion sufficient to overcome his free will and to delude him as to his true position. Psychological coercion renders a confession involuntary. Whether psychological coercion exists depends upon a weighing of the circumstances of pressure against the power of resistance of the person confessing; what would be overpowering to the weak of will or mind might be utterly ineffective against an experienced criminal. See 14 Fla. Jur. 2d, section 140, page 234. Jenkins, Strenges and Cerbone repeatedly told Woods that they would "help him" if he confessed and he would "hurt himself" if he didn't, as set out in great detail above. As Judge Letts stated in the case of *K.H. v. State*, 418 So.2d 1080 (Fla. 4th DCA 1982),

> "It is utterly consistent with any child's upbringing to suppose he can escape punishment ment by truthfulness and candor. Accordingly, we are of the opinion that the child, once having been programmed to believe that complete honesty would solve his dilemma while lies would compound it, was entitled to assume that honesty would be his best policy."

The fact that Woods was given his Miranda rights does not dissipate the taint of his confession improperly induced by promises. See *M.D.B. v. State*, 311 So.2d 400 (Fla. 4th DCA 1975) and *Haley v. Ohio*, 68 S.Ct. 302 (1948). Likewise, the taint was not dissipated by the fact that the defendant spoke with his father before the final videotape. When Jenkins told Mr. Woods that if the defendant confessed he probably would be used as a witness, Mr. Woods then became the unwitting agent of law enforcement.

In the instant case, there was abundant, credible evidence of the defendant's subnormal intelligence, making it unlikely that he had an intelligent understanding of his constitutional rights from the mere reading of the Miranda card to him, without further explanation or

inquiry. Woods was easily susceptible to the brainwashing technique employed by superior forces. Compare the above facts with those in *Ross v. State*, 386 So.2d 1191 (Fla. 1980), a case closely analogous not cited by the parties.

This court has given due consideration to the two main cases on which the State has relied in opposing this defendant's motion, but finds both to be readily distinguishable. In *Burch v. State*, 343 So.2d 831 (Fla. 1977), the defendant was a mature adult. His confession was corroborated by physical evidence at the crime scene, adding to its trustworthiness. In the instant case, there is no corroboration of the defendant's statements. In fact, there is not a scintilla of evidence connecting Woods to the crimes charged, absent his third videotaped statement, nor is there any independent evidence to prove the corpus delicti on the sexual battery charge. Obviously, the hearsay statements of Gibson and Dority are not admissible against Woods, either in a joint or separate trial, unless they each testified at trial. See *Bruton v. United States*, 88 S.Ct. 1620 (1968).

In *Barnason v. State*, 371 So.2d 680 (Fla. 3rd DCA 1979), the defendant was a mentally competent and aware adult. His confession was induced by psychologically effective "agitation and stroking" techniques of questioning. But, unlike the instant case, Barnason was not placed in fear of material or physical harm or given hope of material reward as was Woods.

In conclusion, this was not an easy, spur-of-the-moment decision for this court to make, as evidenced by this lengthy order. Because of my long personal and family background in law enforcement, I have a natural empathy for law enforcement officers who must solve crimes where there are no independent witnesses or physical evidence to assist them. In those difficult cases, confessions are the only alternative. However, illegal confessions have always been deplored and prohibited in our constitutional democracy. While illegal confessions may allow law enforcement to mark their investigative file "closed by confession", they create more problems than they solve, and diminish the public's respect and confidence in the criminal justice system. If a pretrial appeal is taken by the State, I would respectfully urge the appellate court to view all the videotapes in order to perceive the true flavor of the interrogation technique, including the body contact and tone of voices. The inaccurate transcripts are no substitute.